and Allison Jones and Bill Murnau. The Council's not quite set yet. Ms. Jones, you may proceed. Good afternoon. May it please the Court. Allison Jones, Counsel for Appellant Gwendolyn Hardison, an African-American female whose 43-year employment with the Natchitoches Parish School Board ended after her job duties were materially affected. She was placed on a lengthy administrative leave and her employment was constructively discharged. We are here this afternoon, Your Honors, because the District Court erred when it granted summary judgment by failing to apply the appropriate standards for establishing a prima facie case on claims of both race and gender discrimination under Title VII and by making credibility determinations regarding the reasons proffered for the school board's discriminatory actions. Fortunately, this Court reviews the granting of summary judgments de novo. Ms. Hardison submits four assignments of error. Issue number one, it was error for the District Court to rule that Ms. Hardison did not satisfy her prima facie case for race and discrimination under Title VII. The school board conceded all elements of the prima facie case, with one exception, whether Ms. Hardison had suffered an adverse employment action. Ms. Hardison alleged and submitted evidence that she had, in fact, suffered such an action. That adverse action consisted of harassment and threats of termination of her employment by her superintendent, material changes in her job duties as her computer was deactivated and she was excluded from meetings necessary for her to perform her job duties, involuntary placement on a lengthy administrative leave beginning on August 11th of 2015, with several threats of termination of her employment being made at the time, and a constructive discharge of her employment after being left on that lengthy administrative leave under a cloud of suspicion for over five months. Without any analysis, and stating only that this Court relied upon Fifth Circuit precedent, the Court relied upon Fifth Circuit precedent, the District Court determined that those material changes in Ms. Hardison's employment did not amount to what has been judicially coined an ultimate employment action. Ms. Hardison submits that that ruling is erroneous, as one, the jurisprudentially created rule of ultimate employment action is contrary to the statutory language of Title VII, and two, even if it were correct, Ms. Hardison's allegations satisfied the same as the cases relied upon by the District Court for the Fifth Circuit precedent are factually distinguishable from Ms. Hardison's experiences. As noted in our brief, this Court's jurisprudentially created rule of ultimate employment decision is contrary to the statutory language of Title VII, as it in essence deletes the words to otherwise discriminate. Ms. Jones, is that an argument that we can deal with? Is that an en banc argument? Your Honor, it may be an en banc argument. It's been the rule in this Court since Dulles v. Rubin, the decision where it was adopted, adopted of Fourth Circuit, but I would tell you that even if that rule applies here, that in Ms. Hardison's case, Ms. Hardison can satisfy the ultimate employment decision. You can make your argument as you wish, but doesn't it mean a better use of your time to argue the case law that binds us? Prepare to do that. Ms. Hardison does, however, recognize that this Court's precedent holds otherwise, and this Court's precedent, however, is not as restrictive as the District Court read it. Ms. Hardison alleged material changes in her job duties, and if this Court looks at the case of Thompson v. City of Waco, as Judge Smith noticed in his dissent, the Court adopted a materiality approach rather than a former strict approach to a determination of what constitutes an ultimate employment action. In Thompson, this Court recognized that there are factual situations where an employer can place an employee in a situation that materially affects their employment, such as losing essential job functions, being placed in a position where the employee can no longer use their education and skill acquired necessary for the job, being placed in a position where it's less prestigious or involves diminished responsibilities, or being placed under a cloud of suspicion. Counsel, what do you do with McCoy that says administrative leave isn't an adverse employment action? Well, Your Honor, if you look at the specific ruling in McCoy v. City of Shreveport, the Fifth Circuit acknowledged specifically that it was not holding that paid administrative leave was never an adverse action. In that particular case, the facts are distinguishable from Ms. Hardison's case. In McCoy v. City of Shreveport, the patrol officer at issue voluntarily took leave and then was placed on leave, and the Fifth Circuit noted in that case that she was always allowed to return, and when she returned, the person against whom she had made her complaints for harassment had already retired and was no longer going to be there. In this particular case, the fact pattern is distinguishable. Ms. Hardison was involuntarily placed on administrative leave after being relieved of all of her material job responsibilities. She was threatened on numerous occasions with termination of her employment. In this particular situation, because of the involuntary placement and because the superintendent who was threatening to fire her was still employed and, in fact, still threatening to bring charges against her, even though she had been placed on leave over five months, that makes this particular case distinguishable from McCoy, which absolutely refused to hold an absolute rule on administrative leave. So, counsel, assume the plaintiff asserts a prima facie case. Where's the evidence that rebuts the district's good-faith reason or non-pretextual reason? In other words, where's the evidence of pretext? $80,000 of the funds over which plaintiff had authority were misspent, and so where's the evidence to show that the reason for putting her on leave was pretextual? And that goes to our assignment of error number two, Your Honor, which was that it was error for the district court to rule that the school board had a legitimate business reason. The proffered reason was the alleged irregularities in the migrant education program. And here, once again, the district court did not provide much analysis, but if the court looks at the declaration of Ms. Hardison, Ms. Hardison provided sufficient evidence to show that she was never in charge or responsible for this migrant education program. In her declaration, specifically at records 257 through 258, she shows that the school board could easily have determined that these irregularities were not within her job responsibilities. In fact, the school board, based on her declaration, knew that this was a state-run program. Was it arguable that these funds were within her job description? No, it wasn't even arguable. And the district court determined that the school board had a good-faith belief, but that's a question of fact for the jury. And even if it was arguable, then if you had some suspicion that she might have been involved, perhaps you might want to ask her that question. Instead, the school board here placed her on administrative leave in August of 2015, and she is still on administrative leave in late January, and nobody once asked her, was this a responsibility of yours? In fact— Where's the evidence that the reason was pretextual for discrimination? Well, the evidence that it was pretextual for discrimination was that she was treated differently in this instance than a similarly situated white male compared to her, Stephen Solomon. And she pointed that out in her complaint. She pointed that out in her declaration. And so it's a disparate discipline type case. Race was a motivating factor because she was treated differently than her similarly situated employees. In that particular case, Mr. Solomon actually was responsible for significant losses at the school board. He was never placed on administrative leave. He was never disciplined by the school board. And so that's the pretext. That's the discriminatory aspect. In this case, the district court really just kind of glossed right over that and said, oh, we have an honest belief or a good faith belief that there was an investigation here. Well, how honest can that belief be if my client is, A, never made aware of the allegations against her, only placed on paid administrative leave, never questioned about the allegations against her, and nobody ever even tells her what type of investigation is going on? That, to me, would be a question that the jury gets to answer. That, to Ms. Hardison, would be an issue where motion for summary judgment should not have been granted. The issue also is not whether the school board indulged in an honest belief, but whether the school board indulged in a racial or gender bias against her. When it engaged in something that could have been perhaps a mistaken belief. And that bias is shown in this case because a similarly situated male employee engaged in more egregious conduct and was not treated to this type of treatment. Ms. Hardison is entitled to have a jury then evaluate the honesty of that belief. And as pointed out by the United States Supreme Court in Reeves v. Sanderson-Plumbing, when she established with her declaration that the proffered reason was false, then those credibility determinations, those are the determinations that should be made by a jury, not by the court. Simply put, we believe summary judgment was granted improperly because Ms. Hardison satisfied her prima facie case not just on the materiality changes in her job, the paid administrative leave that's distinguishable from McCoy v. City of Shreveport, but also because she was constructively discharged, which this court has recognized as an adverse employment action. And we believe that summary judgment was improperly granted because she also established genuine issues of fact as to the legitimate business reason that was proffered by the school board. Our third issue for appeal is that the district court erred when it held that the school board did not violate Louisiana tenure law. This particular issue on appeal is inextricably linked to the constructive discharge argument because Louisiana law establishes a discipline that says that you are disciplined if you were involuntarily demoted or dismissed. Ms. Hardison contends and believes that she has shown through the evidence submitted in her declaration that she has satisfied the Arion v. Walmart six factors that the court normally looks at for constructive discharge. One of those is reduction in job responsibilities. One of those is demotion and less prestige. We concede that there was no pay loss up until the time of constructive discharge, but that doesn't mean that being left over five months on administrative leave under a cloud of suspicion with nobody giving you any indication that you're going to return and the last statement you heard from your superintendent was that charges were going to be brought against you wouldn't lead someone, a reasonable person, from their perspective in their shoes to believe that their employment had been terminated. So if Ms. Hardison prevails the genuine issue of fact is to constructive discharge, she should likewise prevail with respect to her Louisiana tenure law claim. The final issue on appeal is that Hardison's contention that the court erred when there was a genuine, when it held that there was no genuine issue of fact regarding her defamation claim. The district court found that even if the school board was wrong when it made these allegations against her, that if they had a reasonable belief regarding the saying, that summary judgment should be granted. And Ms. Hardison contends that based upon the evidence presented, that even a factual review of the actual circumstances would show that they did not have a reasonable belief that she was responsible for these irregularities. Also, they never once asked her. If this program fell under her jurisdiction and she was responsible for several programs, all they had to do was ask her before being placed on administrative leave. And so we believe that summary judgment should not have been granted with respect to that defamation claim as well. In conclusion, Ms. Hardison had an unblemished 43-year record of employment. That's stunning. With the school board all the way up until August of 2015. Genuine issues of fact regarding each of her claims exist. A jury should be able to decide her claims. And for all of these reasons, Ms. Hardison requests that this court reverse summary judgment and remand this case for further consideration. Thank you. Thank you, Ms. Jones. Mr. Norwell. Good afternoon. Homer Noah of Hammonds and Seals on behalf of the Natchez Parish School Board and Superintendent Dale Skinner. I'd like to review just very briefly what brought us here today as far as the factual circumstances because I think it is very significant, very important. This whole thing was initiated not by the Natchez Parish School Board, not by Superintendent Dale Skinner, but as a part of a monitoring program from the Louisiana Department of Education. The migrant education program is audited every three years. And as a part of that audit, families in the migrant program are contacted and outside evaluators are used to determine these people are eligible for these funds, for their children, their families. In May, as the briefs point out, in May of 2015, the school board was notified that there were issues or there were problems, and this was from the Department of Education, that there were issues with the program and they were egregious issues within the migrant program. Counsel opposite says that the plaintiff wasn't responsible for the program. Is that accurate? No, sir. I don't think that's accurate at all. As far as the State Department of Education is concerned, she's the director of federal programs, federal funds. She's responsible, her department is responsible for supervision of many programs under the auspices of the federal programs within the school board. And so, as far as the school board and as far as the Department of Education are concerned, she and her department are responsible to make sure these funds are managed and this program is managed properly. Well, when we look at the issue of pretext to the extent that it becomes relevant, it needs to be seen perhaps. It seems to me that what the school board and other decision makers on here knew, what they did to get to the bottom of this, is at least some relevance to whether we could hold as sort of a bottom line that there's nothing pretextual about what the school board did. Is that in the record really? I mean, it's one thing to say there needs to be evidence that this was not the actual reason and wouldn't, well, that it wasn't actually the reason. But once she was put on administrative leave, did she have any role of the plaintiff in part of the audit and getting to the bottom of what happened to the money? Was she ignored, as Ms. Jones was suggesting, and not even questioned about this? You know, let me answer the question. This is when I will answer your question. In 20-20 hindsight, it's a wonderful thing sometimes. I'm going to restructure it because I'm asking you the wrong thing, but still answer my question. No, sir, I will answer your question. I will answer your question. That's what all the lawyers think, but just answer my question. When the school board was notified, yes, sir, the school board was notified at the end of May when the people from the Department of Education came in and told them there were some egregious things going on with this program. They weren't focusing on the plaintiff, were they? Well, they didn't know, the school board didn't know the extent to which Ms. Hardison was or was not involved, what knowledge she may have had or didn't have. There were some problems, obviously, with the employees of the school system not doing things properly. So based on the knowledge that they had at the end of May, they were informed, you've got some real problems in this migrant education program, which is under the supervision of Ms. Hardison as the director. So they say, we're going to come in in a couple of weeks in June, and we're going to conduct a full-blown audit of this program. Well, the audit uncovered some pretty egregious violations to the point to where the record shows 60 percent of the children that participate in Families in the Migrant Program were receiving assistance improperly. They didn't qualify. And so that turns into an investigation that the State Department is conducting, not the school board. And the State Department made a determination that was issued in July that the school board, you're going to have to follow a corrective action plan. And number one, you've got to have some better checks and balances within the department, again, under Ms. Hardison's supervision. And number two, that all these things that happened came on her watch, and that you're going to have to pay back, as Your Honor pointed out, approximately $80,000 because of this. So what the superintendent decided to do at that point was he didn't know the extent to which she was involved because of the investigation that the state had conducted. Well, did the school district put her on leave solely based on what the state investigation determined? Well, the state was investigating this entire matter through the migrant program. The state was the one that put them on notice. Yes, sir. Let me ask you a different way. What did the school district do before putting the plaintiff on administrative leave? Basically, the school board was responding to the directives they were receiving from the Louisiana Department of Education. Well, back to Judge Southwick's question and what counsel opposite said. Why didn't the school district talk to her? At some point, they were concerned about the extent to which she may or may not have been involved, which I think is a reasonable, rational concern. They didn't know. Was that an assumption without talking to her? Well, I think the attitude was we need to be very cautious. We don't know the extent to what she was involved or was not involved. Was the whole division or department put on administrative leave? Well, the migrant education program folks, they were notified, and all of their records were scrutinized. Wait a minute, counsel. Plaintiff was put on administrative leave? Because she's the director of the department. She's the director. All right. The buck stops there. Well, but did the school district put anybody else on administrative leave based on the state's investigation? At that point, to my knowledge, no, sir. All right. What about counsel? Counsel opposite said something that there was a white male employee who had been involved in similar infractions who was not disciplined put on administrative leave like the plaintiff was. Mr. Solomon, Your Honor, I have no idea. Mr. Solomon was the business manager for the school board. He was in the administrative, the business offices, and we've spoken with the personnel director and others. Mr. Solomon left his employment with the school board to take a job in private business. To my knowledge, he was never disciplined, never reprimanded because he didn't do anything wrong. Was he involved in this program? No, sir. Not at all. It's just totally unrelated. He was not similarly situated. He was the business manager for the school board. I have no idea what the complaint is with regard to Mr. Solomon. There's no allegation of misappropriation of funds or anything else that I'm aware of, and I've spoken with the former superintendent and the personnel director. Mr. Solomon was a totally different situation. I was just told that Mr. Solomon decided to leave his employment voluntarily with the school board because he took a job with an outside business interest. All right. So he may not be an exemplar or similarly situated. But what of counsel's argument that the plaintiff has shown that the reason given by the school district was pretextual? In other words, if the school district put her on administrative leave but didn't do any investigation itself and didn't really talk to her, didn't see whether she was involved in this or not involved, to get her version of events, does that lend credence to the plaintiff's argument that this was pretextual discrimination? No, sir. Not at all. Because the investigation was in the hands, the school board was responding to what the State Department told them to do and what they were asking them to do. And so, again, out of an abundance of caution, that's why Ms. Harrison's computer was shut down. They didn't know what she did or didn't have. So, again, 20-20 hindsight is a great thing. But as of May, June, July, the school board is essentially responding to requests for information and the independent audits that were being conducted by the Department of Education. And so, basically, they wanted to maintain the status quo. And by maintaining the status quo, they were concerned the extent to which Ms. Harrison needed to be involved because there were already concerns that she was not watching the ship appropriately. Was that communicated to her at the time she went on leave? I'm not aware that it was, Your Honor. What was communicated to her when she went on leave? When she was placed on leave, the corrective action plan and the other things that were implemented by the State, when those things came down and said you owe us $80,000 at that point, the superintendent contacted Ms. Harrison and said, I'm going to place you on administrative leave because, again, you're supposed to be in charge of administering these programs. Obviously, there's some really serious issues in this department with these programs. And so he said, based on what I've heard so far, you have been derelict in your responsibility of supervision to monitor these programs, to allow this to have happened. And so when he talked with her in early August, he had already made a decision. He said, well, I've got this problem with the migrant education program. There may be other problems in our federal programs. And so he asked the State for the other federal programs that they were involved in to continue the process, not just the migrant education program, but he said, I would like to have all the programs under your supervision evaluated to see if there are any other problems. And, in fact, other problems were developed. And that whole process took months. I think I may have started us down this path, and you're being helpful to us in understanding the big picture, but this is a Title VII race discrimination case. Yes, sir. And we're not judging the fairness of what the school did before putting this woman on administrative leave. It's whether they violated Title VII when they did it. And I haven't seen any evidence of a racial motivation. There is the argument there's somebody else who has treated the white person better than this. Certainly, opposing counsel can respond to that. Let me ask you about what seems to me a fairly good point, maybe not a winning point, but a fairly good point that Ms. Jones made about McCoy. When you look at McCoy, and it talks about constructive discharge, it goes through six factors that we have identified. But then it says, looking at the evidence, like most favorable to the employee, we're satisfied an employee would not have felt compelled to resign, was not demoted, no reduction in salary paid in full. She was relieved of her job responsibilities, but only at her own request. Never indicated to her she would not be reinstated when cleared medically to return to work. It does seem to me that if we're looking at what is an adverse action, what is going to force somebody, I shouldn't have said adverse because I'm getting back to the big category. When looking at what is a constructive discharge, if someone is treated in such a way, and these six factors help us, that they're going to not want to work there anymore. It does seem to me that Hardison is in a worse position, maybe not sufficiently worse than McCoy was. Isn't McCoy distinguishable because of this freedom to return to work whenever she was medically cleared, wanting to go on administrative leave? No, both of those are fairly significant when you're looking at the effect of a potential constructive discharge. Well, obviously, Ms. Hardison did not lose her position. Her title is direct— Could she come back to work whenever she wanted to? Sorry? Did she ask to go on administrative leave? No, sir. McCoy did ask to go on administrative leave. Could she come back as—was she told she was entitled to come back as soon as this investigation was over, if she was cleared? There were some discussions as far as the reason why she was being placed on administrative leave was because the investigation was ongoing. I don't think anyone ever told her, you can come back as soon—it never got that far. That's another distinction, though. It doesn't seem to me McCoy stands for the proposition, at least on its face, that administrative leave cannot be a constructive discharge. It seems to me that it depends. It depends on how much—how close to a discharge, how unpleasant has the workplace become, which is what the overall set of factors are looking to. The person's not been fired, but the conditions are so deplorable that no one would want to go back. It does seem to me there's more of that in this case than there was in McCoy. We honor this case, again, because of the corrective action plan that the state issued in July, because of the investigation that had gone on April, May, June, into July. And then the concern was, and I think it was a very legitimate concern on the part of the superintendent and the school board, what else is there? Could there be anything else? And maybe there's not anything else, but could there be anything else there? And so that's the— Did the school board ever really determine Ms. Hardison had done anything improper, or was this just based on—she was the one in charge of federal programs, as you put it, I think. Put it—this was on her watch. She's going to bear the cost of these mistakes. And that's what the school board basically—though we never made a final decision, that's what the school board—it seems to me from what you've said, that's basically what the school board was deciding. Well, part of her responsibility, Your Honor, was to work—these were employees in her department, and if these employees were going out and affirmatively soliciting and using improper recruitment techniques, there's a bad faith motive there. And so they didn't know at that point in time whether she was encouraging bad behavior or not encouraging it. You never found out, though, did you? Sir? You never did find out one way or the other, did you, the school board? I'm not sure. To my knowledge, they never did. All they knew was that there was some bad behavior going on to the point to where there was a criminal referral made to the inspector general's office, which is a pretty serious violation. So they knew there were some really serious issues with regard to forgeries, misrepresentation of various information. There was some really bad conduct going on. And so at that point when all that was divulged and the fact that over 60% of the families that were involved were receiving benefits improperly, then the superintendent of the board very reasonably, I would submit, said, look, we're going to maintain status quo. Now, it wasn't their fault that when the superintendent, I think, properly asked for the department to do more investigations or more audits just to see, you know, audit all my programs, the State Department took from August until January to come back with a report to the superintendent, and that report was that there were discrepancies. There were more problems in the federal programs, and that's in the record. So the school board didn't intentionally just punish her by putting her over on the side, so to speak, that she was placed on administrative leave officially in August while these other programs were being investigated by the state, and then they rendered a report in January, and shortly thereafter, and I might add, Ms. Hortonson didn't have Ms. Jones. She had another counsel, but she was, this entire time, she was operating under benefit of counsel. So when the other report comes out, then she resigns. Once the evidence developed, yes, that she was told, Ms. Hortonson was told, when are you going to resign or are you going to be terminated? Wasn't there, if you think it's too harsh a word, give me a better one, but wasn't there a threat of termination if she didn't resign? Well, I wouldn't call it a threat. You wouldn't like that word, but regardless. I think, yes, sir, I think the superintendent asked her, based on this information, are you going to resign, and if you don't resign, I'm probably going to pursue charges against you. That also distinguishes McCoy. They seem to be welcoming McCoy back with open arms as soon as her medical issues cleared. Well, again. They were pushing her away. He could have gone ahead and taken action at that point, but he chose not to. He wanted to see how the, again, I think that's very reasonable. He wanted to see how the investigation panned out that the state was conducting. So I'm going to put you on administrative leave. You're still the director. All these other things, you haven't suffered a loss of pay, anything. I'm just suspending you with pay until this entire matter is concluded. And so she pre-terminated things when the second part of this came out from the state that there were other problems. Again, with the advice of counsel, she pre-terminated things. She resigned. Let me ask. We're going to hear because I'm going to ask, but I imagine Mr. Jones may address it regardless. Are you saying there is nothing in this case, no matter how insubstantial your view, that creates a question of racial discrimination? There is no exemplar. There's no person who is also caught up in this web that you've been describing a possible misuse of federal money that was white and not discharge that would be considered similarly situated to me. Judge, I don't think there's any scintilla of evidence at all. What are you going to say when we see her up here again? I don't think there's any evidence at all that race or gender has anything at all to do with this case, none whatsoever. Okay. Anything else? No, sir. Thank you. Thank you, sir. Ms. Jones? Yes. Addressing the first question. I'm sorry. I thought he was asking something. Go ahead. Addressing the first question that was asked by the court with respect to whether these responsibilities for the migrant education program were Ms. Hardison's responsibilities, I would direct the court to Ms. Hardison's declaration where she stated very clearly that this was a state responsibility. It was a state-run program. The state was responsible for training these migrant advocates. Counsel, who ran it for the district? There was nobody who ran it for the district. Did this fall under her department? It was something that fell under her department, but her only responsibility was with respect to budgeting and to ensure that the migrant advocate that worked for the state turned in reports, not to review the substance of the reports. Boy, that sounds like a bureaucrat's answer. It fell under her responsibilities as defined under the school district, yes or no? It fell under her responsibility as defined by the state as to what her responsibilities were. She did not have responsibilities for training. She did not have responsibility for the substance of reports. She did not have responsibility for eligibility requirements. She had responsibility for the funds? Not the funds at issue. She had responsibility for budgeting for travel expenditures for each one of those migrant advocates, and that was it. And that is in her declaration. Why did the state get the district to send $80,000 back to it? It's the state's responsibility. It is true that the state trains the migrant advocates. It is true that the state determines eligibility requirements, and it is true that the state runs this. The state had an employee that worked at the school board's office, a data specialist who was reviewing all of these reports, and they do conduct audits, and they did determine that there were eligibility requirements that were not met, but that was not something that fell under the responsibility of Ms. Hardison as director of programs. Ms. Jones, let's say you're – well, I'm sure you are completely right. I'll start with that. If you're not, so be it. How is that helping you on your Title VII claim? It seems to me the most that you're saying is that the school district mistreated her. I don't want to use too strong a word, but used her as a scapegoat. These problems happened while she was there, and they sort of kind of maybe fit under her responsibility. None of that's a Title VII problem. How do you make it a Title VII problem? You make it a Title VII problem by applying a disparate discipline analysis. When you go to Ms. Hardison's declaration, she testified that Steve Solomon, who was director of another department, had been found guilty of several monetary losses and violations, had never been placed on administrative leave, and had never been disciplined. He was a similarly situated – What was he violative of? I should read the declaration, but how comparable is that? Well, it's comparable under Lee v. Kansas City and the Garcia when we look at similarly situated, comparable coworkers. We have the same superintendent. We have the same school board. We have the same decision makers. While they have different responsibilities, they are lateral. They are under the same analysis, same situation, and the disciplinary violations that are alleged against them are nearly identical. And so applying that analysis, then, you get to a race and a gender. I'm sorry? When did the Solomon event occur in relation to this one? In her declaration, I think she says that it occurred shortly before, but I don't know the exact time frame. It's not connected to the investigation of – No, they're completely different. Unrelated problems in the misuse of federal money in both cases? In both cases, yes, sir. We'll have to look at that. And so that's in her affidavit, her declaration, that shows the gender and the race bias. But also, if you look at Reeves v. Sanderson-Plumbing, when you establish that a proffered reason is false, or I think the language is unworthy of credibility, then that leads you to – Unworthy that someone who was in that area of responsibility maybe was treated unfairly. She had a connection to these problems. So I don't know if it's unworthy of belief, but it may be unworthy. It may have been unfair. That's not what I think the standard requires, is that that's not really why they fired her. But aren't you making a credibility determination at that point? Aren't you making a credibility determination at that point? Because if you look at what she alleges, was that she did not have responsibility for that program. They allege that the state had responsibility and the state was going to do an investigation. Nobody talked to her about this. And one final point I would like to address for the Court, because you asked this question, would she be allowed to return to work? If you look at her declaration, attached is Exhibit A to that declaration is a letter from the superintendent that said she is going to be placed on administrative leave until further notice and that charges will be brought against her. She was not ever welcomed back, as in the McCoy case. She was not allowed to return to work, and she was threatened with discipline not more than four times before being placed on leave, but also at the time of being placed on leave. And so a reasonable person in that position would have considered themselves constructively discharged. Thank you. Thank you. That concludes our arguments for today. These cases will be submitted and taken up at this time. This panel will adjourn until 1 o'clock tomorrow morning. Excuse me, 1 o'clock tomorrow afternoon.